Good morning. May it please the Court. I am Maggie Smith and I am from the Department of Justice here on behalf of the United States. I would like to reserve five minutes of my time for rebuttal. In this appeal, the United States simply asks this Court to reinstate the terms of the consent decree and apply the decree as written. That 130-page comprehensive agreement was negotiated over the course of many years, involved technical and legal experts on both sides, and was negotiated under supervision by a Court-appointed mediator. It is a complete and binding agreement that the County freely chose to sign. Before we act, I suspect we ought to check whether we have the power to do so. So at some point, I hope that you'll spend some time on the jurisdiction issue. I'm happy to discuss jurisdiction, Your Honor. At your convenience. Well, as it's a threshold issue. One-third of the panel is very concerned about it. As it's a threshold issue, I'm happy to discuss it at the outset. It's our – this Court's precedent is very clear in Hook v. Arizona that when a court modifies injunction – modifies a consent decree to alter the prospective injunctive relief that a consent decree offers, then the court has – this Court has jurisdiction under 1292A. The District Court's decision in this case very clearly altered the injunctive relief that the United States negotiated for in the consent decree by lifting the County's obligation to implement the remedy selected in the OU-1 rod. And as our response to the motion to dismiss shows, the County has in fact exercised its right not to conduct work that the Forest Service believed was covered by the terms of the PCD on the grounds that it was no longer required to continue the work due to the Court's order. This – Is this in a sense, as you see it, that modification is a temporary injunction? The District Court's modification? Yes. Whether – I mean, the Court could always revisit its finding. That's – you know, the Court retains that power, the power to do so. But that would be the case under any modification of any consent decree. It's not clear why it would be different here. The District Court did not enter any type of judgment. The District Court was then going to have hearings to determine the amount that is involved. So there's no judgment as such that's come from the District Court. Now, I'm just trying to see whether we've – whether we need to wait for that or on what basis we would take a look at the modification of the consent decree. The alteration of the prospective injunctive relief gives this Court jurisdiction under Section 1292. And because, in our view, this is a pure – this is a pure question of law that can be resolved by the Court within the four corners of the consent decree, there's simply no basis for asking the District Court to do additional work or to hold a trial on the exact amount of the so-called liability. Well, there's – if, in fact, and I'm not trying to get you to accept this, but if, in fact, this is like a temporary injunction, then we never get to the merits. We only indicate whether or not, under our law, it was sufficient or reasonable under the four-part test that we've adopted or the Supreme Court has adopted for us as to whether or not we should impose this temporary stay. Obviously, he's going to – he looks at it as something temporary because he says he wants to hold off until he determines damages. Now, if that's true, why wouldn't we treat this as like a temporary injunction, apply the four-part test, and let him get ahead with his damages? Why would we yank it up this early before he finishes with the case? Our understanding is that all that remains to be done in the District Court is a hearing to determine the amount of – the amount that's owed, that the injunctive relief is – at this time has been substantively altered. And that in order to protect – And enter a judgment. Enter a final judgment. That's the other thing we're waiting for him to do. It's not clear to me that a final judgment would be – I mean, final judgment was entered in this case several years ago when the consent decree was – was entered. He's made a modification. Right. He's going to enter a judgment before that's completed. There's nothing until he enters a judgment, is there? These things just fly up here? When the substantive – when the substantive relief bargained for in the consent decree is altered, yes, then they do – they do become immediately appealable. And that's what happened in this case. You mean they are immediately appealable just that part, nothing else, just that part, without a judgment of the District Court? And if – yes. Is that correct? Yes. And the case that you're relying on for that? It's Hook v. Arizona, and we also cited additional cases in our response to the county's motion to dismiss, which is also available to the court. And in the alternative, if the court wished to look at this as some sort of T.R. preliminary injunction, I think it's also very clear that the county has shown zero chance of success in the merits, and that would be an alternate grounds for reversing the District Court's judgment. Judge, England didn't find zero chance. Well, we submit that that – that was, in fact, an abuse of discretion. And I think our – Yeah. His modification order did three things, right? It said, county, you can stop work. Forest Service, you pay for everything going forward. And the thing that's left over on the side is how do we decide who's responsible for the expenses that occurred in the past? That was our understanding of the order. That's how I understood it, too. I'm not sure – I can understand that first part is before us. Right. And second part, too, because – I don't know, is anybody doing anything? Did the Forest Service complete this? The work has been continuing. The county has continued working, but it's not complete. It hasn't been certified as complete. It was – it's going to require at least one more field season. Okay. Wait. I thought – I just got confused. He said, county, you don't have to do anything. Mm-hmm. But county is doing something. They've decided that – I mean, as they said in their brief, that it was in their best interest to continue with the work. That said, they could stop work at any time and, indeed, have refused to do things that the Forest Service have felt was necessary under the terms of the consent decree. So the legal relationship between the parties has been completely upended and altered by the district. They're basically doing what they want rather than what the Forest Service wants them to do. I mean, at this point – And they think the same. Yeah. I think that's correct. At this point, you know, things have been moving forward, but the legal relationship is completely altered. And because what, you know, the – in this appeal, we – you know, there are many, many facts that are at issue here. None – you know, the district court made only very limited factual findings because, in its view, all it needed to determine was whether or not there were design specifications and whether or not those specifications had to be changed, and then it believed, as a matter of law, Spiering dictated a result. So that is the – that's the part. The fact that the specifications had to be changed, I think that's leaving out a very important step. The specifications had to be changed because they were defective. The specifications were proved to be defective in one very important particular – actually, one and a half important particulars. The specifications said there were 30,000 tons of material to be removed, right, with a 10 percent minus and a 15 percent plus. But in the event, there were 66,000 or 60,000 tons to be removed, a substantial difference of 100 percent. The amount is disputed, but we do – But let me ask you this. Where there is a representation by the government as to un – well, partially known and maybe unknown underground conditions, and the party to remove the dirt relies on that representation, why is this not either a unilateral mistake of fact, taking the best view of it from the government's position, or a mutual mistake of fact? Well, the county hasn't pressed that theory, and that – They have in a different way. They said we don't have to follow specifications which are defective. The real defect in these specifications is in the misrepresentation of underground conditions, right? The problem is with the elevation, the elevation that was used in the remedial design. Right, 30,000 tons, but you had to go down 60,000 tons to get rid of all the junk, right? Right. And I think looking at such a – what happened here is you – this is not – I just want to make this very clear, this is – the county is not the Forest Service's contractor. The county is a PRP under CERCLA. Let me ask you a question based on my years of being in litigation with public agencies on one side and the other. Where in this 130-page consent decree is there any paragraph or language which says, in effect, we have represented to you the underground condition based on our best estimate and our best science. However, we make no warranty or representation as to the accuracy of that representation. And third, we urge you to use your own forces to determine the depth of the junk in the field. Is there anything like that? There's nothing that says that specifically, but what is really critical here – I looked and looked and I couldn't find it. We used to find that in the LA County Flood Control documents all the time, and we don't find it here. Because this is not a public works contract, and it is not put out to bid for the county to bid on. What you have here is a CERCLA consent decree. And so what the consent decree accomplishes is quite different. Now, let's be clear. What SPIRN says is that when the government produces design specifications and completion of those specifications is performance of the contract, then the government warrants that performance will be acceptable if the design specifications are followed. Here – Pardon me, counsel. Sharon has to go with respect of methods of doing the work. Here there's not a question about the methods. Undoubtedly, the methods said you have to use some sort of an instrument to get the dirt out of this place and put it over there. That's fine. Methods are fine. The question is a representation of how much junk there was. That's not a – Sharon doesn't have to do with that. And the consent decree makes very clear that the remedial design that was not warranted that the completion of the remedial design would meet the performance standards, that the Forest Service reserved the right under paragraph 12a to make changes to the work. It was not warranted. But what was represented, right, was that their estimate was there would be 30,000 tons. If there were less than 30,000 tons, up to 10 percent there would be a reduction in the payment. If there was more than 30,000 tons, 15 percent, there would be a 20-80 split. Now, put that together with all the circumstances of the consent decree, isn't that a representation that the government's best estimate is that there's 30,000 tons, not 60,000 tons? No, Your Honor. There is absolutely no representation in the consent decree that the amount of work would be capped or that the amount of money – and this is really about the money, how much money the county would have to pay in order to meet the performance standards. When you look at how the county could show that it complied with the terms of the consent decree, it refers only to the performance standards. Paragraph 12a reserves the Forest Service's right to change the work as long as it remains within the scope of the remedy. Now, the real – But it doesn't say change the scope of the work at no expense to the government. There's – that is a clear misrepresentation because the government is responsible if the cost of remediation is above the estimated cost set forth in the remedial design. The government has to pay 20 percent of those expenses. Up to 15 percent over the – No, no, no. But that is not true because there's no cap on the amount of money that might have to be paid under CERCLA, that the Forest Service has to pay 20 percent of anything in excess of 5.5 million until the performance standards are met. I understand that's your view. Can you explain to me what that 10 percent, 15 percent was supposed to do? Because you say it's not a limit. So what was it supposed to do? I mean, it was – these are engineering specifications. So this was the engineer's best guess as to what they were going to encounter. Now, again, I think this is – So since it's something different than plus 15 percent, we have some kind of mistake. I understand they didn't plead mutual mistake, unilateral mistake. But their – your view is, despite that, the 2080 was supposed to cover everything. That's our view. And in the alternative, I think the consent decree is also quite clear of what would happen if the remedial action, the amount of work that could be ordered under the consent decree was not going to be sufficient to meet the performance standards. And under those conditions, the work is not covered by the consent decree, and the United States retained the right to institute a new enforcement action if it chose to do so. So what the district court – and, again, that's not what the county is arguing. That's not their theory. Can I ask you a question? If there were a serious, significant mistake in the misrepresentation and they pled mutual mistake or something like that, what would be the appropriate remedy? The appropriate remedy would be to release the parties from the consent decree and allow them to go back to the bargaining table and come to a new conclusion. Thank you. Excuse me. I had another question. Oh, excuse me, Your Honor. Yeah. I was somewhat concerned. I was looking for your Hoke v. Arizona case, which is out of our court, on jurisdiction. But there's a Supreme Court case of Carson and also a case following up on Arizona   I mean, I think it's important to understand, and I think it's important to enunciate, that if the practical effect of the order is refusing or granting an injunction, we have jurisdiction as an injunction. You didn't mention those cases to us. Don't they apply? We did, in fact, brief. So in your argument just now. Not in my argument right now, because it's our view that Hoke v. Arizona more clearly applies to this set of facts. The Supreme Court says otherwise. What I think Carson involves a slightly, a somewhat different set of facts, and that Hoke makes it very clear that it's immediately appealable under 1292, what we have here. But we did brief Carson in the alternative in our response to the motion, the county's motion to dismiss, and the Court can see our views on why, if, in fact, Carson applies, how that analysis should go. Okay. Why don't you tell me, then, if this is what the Court refers to as has the practical effect of refusing an injunction or granting an injunction, why that doesn't apply here? Oh, we do think it would apply here. We think the Hoke analysis is a more straightforward analysis, but in the alternative we do believe Carson would apply because what the district court did was, you know, it lifted an injunction that was in place due to the consent decree. Would be that we would have jurisdiction to take a look at what the district court did as if it were a temporary injunction? Yeah, that it altered the injunctive relief, yes. Yes. I think the Court has to apply the four-part test. I don't think that the Court has to apply the four-part test. The four-part test would be in the winter. Now would we have to do that in an appeal from a temporary injunction? It's our view that this is not an appeal from a temporary injunction, but in the alternative we think that, you know, that the one. And if we use the alternative, which Judge Wallace has indicated from Carter, from Carson, then we would apply the winter four-part test, right? Your Honor, I actually can't speak to that. I'm sorry. Thank you. Well, the Supreme Court has, so we'll spare you that. Okay. Thank you, Your Honor. You spanked good on that one. Good morning, Your Honors. Tom Bruin for the County of El Dorado. I'd like to just respond to some of the government's answers to the panel's questions. And clarify some numbers. First of all. Could we go on jurisdiction for a second? Yes. Who would be getting the injunction or seeking the injunction if we were applying a four-part test? Well, the effect of the Court's order was to suspend the consent decree pending a hearing. So I'm having difficulty wrapping my arms around that. It's certainly a temporary order. Is it a lifting of a temporary lifting of a permanent injunction? I guess that would be tantamount to a temporary injunction. Okay. I don't know. Looks like, smells like, tastes like. That's what Carson was talking about. Yeah. What is your position on that in the event that we follow the Supreme Court's Carson decision? What's your position on whether the injunction was a temporary injunction and should be sustained until the final judgment? Well, that would be our position, Your Honor, that it makes sense, for one thing, for there to be a full evidentiary hearing before the trial judge so that you've got a full record to review rather than to review. It's not only that. This is a big case. And Judge England, at any time up until the time he signs his judgment, can change his mind. And you're going to get into a lot more evidence here when it goes back. So it's more than just finalization. It's that judges have to keep their minds open until all the evidence is in. That's why they're temporary injunctions. Absolutely. And the other aspect of this. Can I just ask, is she correct that you have been relieved of your obligation to do this work and you instead have opted to go forward? The judge suspended the county's obligation to continue construction of what is now the third redesign by the government. The judge's order came down in July of 2011. We had started the second construction season. We talked to our engineers and we were told if we walked off the job in the middle of construction, the damages were going to escalate even more. So we felt we had an obligation to mitigate our damages. So, yes, we proceeded with the third redesign of the project by the government, and that is essentially complete at this stage. Now, the point I was just about to make was that this consent decree has a temporal element. It's not just constructing or it wasn't just constructing the remedial design, which turned out to be unbuildable, but there's also an element of maintaining. What do you mean unbuildable? It couldn't be constructed. In other words, the designs showed a diagram of a landfill cap that could not be constructed because the original design assumed only 33,900 cubic yards of waste had to be relocated. The actual number was 106,000. 106,000 cubic yards. Why couldn't it be constructed by simply taking more of that junk out and exporting it? Well, that wasn't the that wasn't economic. So that's something else. Whether you can do it is a different question than how much it costs. So when you say it's not buildable, you don't really mean not buildable. You mean not practical, not economic, not reasonable or some other more relative. I think what the engineer said in their declarations was that the design was not constructible, meaning that given the physical conditions, the change in elevations, the change in subsurface conditions, you couldn't do what the remedial design said you had to do to build this project. Well, wasn't it a question of us going down deeper, getting more dirt out and putting the cap over it? It was a question of excavating roughly more than three times the amount of soil. And the contours of the landfill are changed. The drainage is changed. The sedimentation ponds are changed. So it's a fundamentally different design. It's a different design, but it's not unconstructible. It's a constructible design if you get somebody else to write the checks. Well, the original design wasn't constructible. The third design was constructible, and that's what was built. That just happens not to be the design that's incorporated into the consent decree. A question was asked about what is minus 10 plus 15 percent means. The evidence before the trial court is that when an engineer stamps plans in the professional engineering profession, it is a representation that the quantities of waste, that the detailed plans and specifications have a margin of error of plus or minus 15 percent, that the bids are suitable for detailed lump sum bidding, which is what the county did here with the knowledge and participation of the Forest Service. And ---- Did you plead mutual mistake or unilateral mistake? Well, in a sense, yes, Your Honor. What we said was that this was a situation that the parties did not contemplate at the time they entered into the consent decree. If that's what you plead, I think she's correct that you don't then get another deal enforced on the other side. You go back to the bargaining table and make a new deal. Right? Doesn't the deal go away if there's mutual mistake? I don't think that is what the Spear and Doctrine teaches us, or the subsurface misrepresentation. Well, I'm not talking about the Spear and Doctrine, because that applies to fixed-price contracts of cost plus ---- anyway, that's the government contracting situation. I'm asking about the doctrine of mutual mistake. We made a mistake here. I ---- maybe I'm wrong. Maybe I've forgotten stuff from law school, but I thought you went back to ground one, that there is no contract. Mutual mistake vacates offer and acceptance and valid consent. You went to the same law school I did. Well, I guess the question here is when the construction of the third redesign is essentially complete, how does the Court deal with the terms of the consent decree? Does it vacate it entirely, or should it ---- That's a remedy question. Right. But the issue is if there's a mutual mistake or a unanimous mistake, there's no formation of contract. Well ---- Then you have to think about quasi-contract and some remedy, but that's down the line for Judge England. Go ahead. Well, all right, Your Honor. But I think in this case, I do believe that the Spirin case and the subsurface misrepresentation cases ought to apply, because to me, the policy behind those cases is that if the owner of a project hires the engineer, insists on preparing the detailed plans and specifications, enters into a contract with another party to build those plans, and the plans turn out to be defective, resulting in cost overruns ---- But the defect in this case is not one of saying you can't ---- you have to use certain measures to extract the dirt. The defect in this case is not with the methods, as there were in Sharon, but with the representations of quantities. That's what you're really talking about. Well, the representations of quantities, the location of subsurface conditions, and in those subsurface cases ---- With the French drain on the side, on the western side ---- Well, my point is in those subsurface cases, the remedy wasn't to rescind the agreement with the government. The remedy was to say to the contractor, you've been damaged because of the defective plans, and you are entitled to a remedy against the government for those plans. You've made an interesting outline, which I almost thought I was up here a year from now with the final judgment. Has the district court already made findings of fact and conclusions of law along the line that you're indicating? The judge found that the plans were significantly flawed. Yeah, but he hasn't done any specific findings of fact and conclusions of law. Correct. So we don't have that to review yet. That's true. And I suspect that if this case goes back, that at some point he's going to ask both counsel to provide assistance in developing findings of fact and conclusions of law upon which his judgment will be based. I expect that to be so. And at that time we'll have something to review. You will. It's looking more and more like something looks like must be temporary injunction because there's so much left to be done. I'm having difficulty understanding how we're going to make a decision on this case without findings of fact and conclusions of law other than the beginning point, which Judge England said that it has to be changed. But we don't have anything yet by way of findings and conclusion as to what's going to be changed and what he's going to require. That's true. And that was a point that we made in our motion to dismiss the appeal originally. Which was turned down by the appellate commissioner and referred to our panel, which we have before us now. Yes. The trial court in reviewing the consent decree found that there was no disclaimer of any remedy of any potential defects in the design. The remedial design is incorporated into the consent decree. And I think that rather than tell the county it must totally relitigate this case with the government in terms of a response cost action, I would urge the panel to reconsider the application of Speer into this case. This case settled based on the preparation of the 100% final design and a bid process that the county went through that was supervised and actively engaged in with the Forest Service. They looked at our bid package. They knew we put their final design out to bid. This case settled with all the major PRPs based on the final design and those lump sum bids. The city of South Lake Tahoe then settled with the government. South Tahoe Refuse, which actually operated the disposal site, settled with the government. And so did the county. A pool of money was raised to build the remedial design. The county put in roughly 20% of that pool. It was the county's expectation entering into the consent decree that the design was accurate and would be buildable within the pool of money that had been raised to build that design. Now, on the issue of mutual mistake, you know, we don't really have a finding on the trial court on that, but I do want to point one thing out. During the course of construction, when it was discovered that there was waste outside the footprint shown on the plans, the government produced photographs of the original French drain, which was outside that footprint, that had trash in it. We didn't know about those photographs when we entered into the consent decree, but somebody at the government must have. So this raises the question of, really, was it a mutual mistake, or did the government have some reason to know that its plans might have been flawed? Again, we haven't had discovery. We haven't had the benefit of an evidentiary hearing. And it is possible, of course, that through discovery and an evidentiary hearing, we can deduce facts that the government was more than just ignorant of the potential inaccuracy of the plans, but actually had some reason to believe the plans might be inaccurate. So that would, again, I think change the complexion of this case and could well influence Judge England's final decision in this matter, which I think is another reason why it makes sense to proceed with discovery and proceed with a hearing before Judge England to fashion an appropriate remedy. And the remedy here just isn't money. We have an obligation under the consent decree to maintain this cap for another 30 years. It's a different cap now. It's much steeper. And what that means is when rainwater runs off this cap, it will be running much faster. And we believe that the drainage system around this landfill is going to fail because the design has been changed. You know, I don't understand what you're saying about jurisdiction. We have an obligation to determine our own jurisdiction. But your motion to dismiss for lack of jurisdiction was denied without prejudice to renewal. And then when you filed your brief, didn't you say the county agrees with the Forest Service Statement of Jurisdiction? You didn't renew it. We did, Your Honor. You did. How did you renew it? Good question. Okay. Thanks. Well, we have to determine it anyway, but I'm very confused as to how you renewed it with that statement in your brief. All right. Well, all right. We probably felt that we didn't have a shot at having the panel consider that, but we certainly would ask the panel to consider that. All right. Unless the panel has any other questions, I will submit our brief. Thank you, Your Honor. I recognize that I had used all my time, so to take a minute. Okay. Thank you, Your Honor. I think what is really important here is the text of the consent decree. And it's very telling that the county, although it agrees that this is a contract that should be interpreted within its four corners, has cited almost exclusively to extrinsic evidence in its brief and before the panel today has discussed its own unilateral expectations when it entered into the contract. We would ask the court to look at the plain language of the consent decree and look at what it accomplishes based on its clear terms. As to the question of mutual mistake, to the extent the court believes that there is an issue there, we still believe that reversal is appropriate. The county has not asked for a remedy that would get it, that would release it from the consent decree, would release both parties from the consent decree. And if it wants to pursue that as if the work were outside of the scope of the remedy as described in paragraph 12A, then under the consent decree it has an obligation to use the dispute resolution mechanisms in the consent decree and then go to district court only after those have been pursued. And I'd also like to just, again, point out that this is not the Forest Service did not develop this remedial design and in fact it did not do it alone. The county did the remedial investigation. The county did the initial estimates of what, of the amount in the landfill. It was the county that began using the assumed data map. Kennedy. You're talking about circumstances. A moment ago you said we should look at the text only. Now you're talking about circumstances which are favorable to you. Well, these are, they are extrinsic, Your Honor. But I do believe, you know, just to get the Court a sense of the equities, you know, I think that that's a really important part of this case to the extent the Court wants to look beyond the four corners of the document, which we would urge you not to do. And if there are no further questions. Thank you very much. Thank you. And with that, the calendar is exhausted. And we will adjourn until tomorrow morning at 9 o'clock. Thank you.
judges: Restani, Wallace, Bea